## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No.

CONVERDYN,

Plaintiff,

v.

HEATHGATE RESOURCES PTY., LTD.,
GENERAL ATOMIC TECHNOLOGIES CORPORATION,
NUCLEAR FUELS CORPORATION,

Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, ConverDyn, through their attorneys, Koncilja and Associates, P.C., states the following for their Complaint against the above-named Defendants:

### I.    PARTIES, JURISDICTION, AND VENUE [1]

1.    Plaintiff ConverDyn ("ConverDyn"), is a general partnership formed under the laws of the State of Delaware with its principal place of business located at 7800 East Dorado Place, Suite 200, Englewood, Colorado 80111.

---

[1]  Some of the information included in exhibits attached to this Complaint contain information as to price and quantity that is treated as confidential in the industry.  ConverDyn has redacted that information from Exhibits A, B, C, D and E.  The unredacted versions of Exhibits A, B, C, D and E are being filed under seal.

2.      ConverDyn is a partnership between General Atomics Energy Services, Inc., and General Atomics Energy Services, L.P., and Honeywell Energy Services, Inc. ("Honeywell").

3.      Defendant Heathgate Resources Pty. Ltd. ("Heathgate") is a limited proprietary company organized under the laws of Australia and having its principal place of business located at Level 9, 45 Grenfell Street, Adelaide SA 5000, Australia.

4.      Defendant General Atomic Technologies Corporation ("GA") is a corporation organized under the laws of the State of Wyoming with its principal place of business located at 3550 General Atomics Court, San Diego, CA 92121-1122.

5.      Defendant Nuclear Fuels Corporation ("Nuclear Fuels") is a corporation formed under the laws of the State of Delaware with its principal place of business located at Farm Rd. 81, Hobson, TX 78117 and with offices in Colorado located at 7800 East Dorado Place, Suite 210, Englewood, CO 80111.

6.      ConverDyn, Heathgate, and Nuclear Fuels are affiliates of each other and subsidiaries of GA.

7.      Heathgate has conducted business through an office located at 7800 East Dorado Place, Suite 210, Englewood, CO 80111.  Heathgate conducts business in Colorado through Heathgate's Vice President of marketing, who until recently maintained an office at 7800 East Dorado Place, Englewood, Colorado, as well as through its agent, Nuclear Fuels Corporation, acting on behalf of Heathgate.

8.      Heathgate has entered into an agency agreement with Nuclear Fuels' which directs representatives at the Englewood, Colorado offices of Nuclear Fuels to act on behalf of

Heathgate.  In addition, Heathgate routinely receives correspondence at Nuclear Fuels'
Englewood, Colorado offices.

9.     GA conducts business in the State of Colorado.  GA, on behalf of Heathgate and
Nuclear Fuels, controls a uranium account in Metropolis, Illinois and orders transfers to, and
from, this account through book transfer in ConverDyn's Colorado office.  GA also conducts
business in the State of Colorado through its control over GA entities, including Heathgate and
Nuclear Fuels.

10.     Nuclear Fuels conducts business within the State of Colorado and maintains an
office located at 7800 East Dorado Place, Suite 210, Englewood, CO 80111.

11.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 28 U.S.C. § 1367.

12.      Venue is proper in the United States District Court, District of Colorado,
pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to
ConverDyn's claims occurred within the District of Colorado, and because title to a substantial
portion of uranium that is the subject of this action is transferred via book accounts at the offices
of ConverDyn in Colorado.

## II.     SUMMARY

13.     It is well known in the nuclear fuel industry that the activities of GA subsidiaries,
Heathgate and Nuclear Fuels, are directed and controlled by GA.  GA is owned and controlled by
James Neal Blue ("Mr. Blue").

14.     Beginning in approximately 2000, Mr. Blue directed Heathgate, which owns the
Beverley uranium mine in Southern Australia, to aggressively court the world's largest utilities
to enter into contracts to sell uranium from the Heathgate mine.  Mr. Blue and GA wanted

Heathgate to commit approximately 50% of Heathgate's uranium production to these long term sales contracts so that GA & Heathgate could persuade their banks to finance the operation.

15.     Heathgate and an affiliate, ConverDyn, were successful in this endeavor. As, explained in more detail below, Heathgate and ConverDyn entered into a Sale & Purchase contract on September 30, 2003 for the sale of uranium to ConverDyn at a fixed price that would escalate at a fixed rate over the 4 year term of the contract ("Heathgate/ConverDyn Sale and Purchase Agreement.") Then, on or about October 1, 2003, in a "Back to Back" transaction, ConverDyn entered into the Agreement for the Supply of Uranium Hexafluoride with Dominion Nuclear Connecticut, Inc. ("Dominion") ("Dominion/ConverDyn Supply Contract"). ConverDyn agreed to purchase uranium from Heathgate in order to supply UF6 to Dominion. Heathgate and GA were aware of the terms of the Dominion/ ConverDyn Supply Contract. These two contracts are known in the industry as "Back to Back Contracts."

16.     As the price of uranium rose to $17/pound, Mr. Blue and GA directed Heathgate to develop a strategy and plan to terminate these long term contracts, including the Heathgate/ConverDyn Sale and Purchase Agreement because GA and Heathgate could make an additional $54 million by selling the uranium elsewhere. As the price of uranium increased to $42/pound, GA and Heathgate have proceeded with this plan. On April 21, 2006, Heathgate refused to deliver 240,000 pounds of uranium to ConverDyn. Heathgate has also refused to deliver to at least one other utility which has a long term contract with Heathgate.

17.     Heathgate has uranium available to make the delivery but has refused to make the 240,000 pound delivery of uranium to ConverDyn on April 21, 2006 at the agreed upon price of $11.08/pound. Heathgate is obligated to deliver a total of 589,000 pounds of uranium to

ConverDyn over the remaining term of the Heathgate/ConverDyn Uranium Sale & Purchase Contract. Heathgate has made it clear that it has no intention of performing its obligations under this agreement.

18.     As Heathgate knows, ConverDyn is obligated to deliver the uranium that was to have been delivered to ConverDyn to Dominion, a U.S. utility.

19.     As the result of Heathgate's breach and repudiation of its contract with ConverDyn, ConverDyn is now in breach of its obligations to deliver to its customer Dominion. Over the term of ConverDyn's contracts with Heathgate and Dominion, ConverDyn will suffer in excess of $17 million dollars in damages. Thus, ConverDyn is seeking specific performance as well as damages from the Defendants.

20.     Internal documents from GA and Heathgate establish that the Defendants put this plan to breach these supply contracts into place in 2004 and are now proceeding with the plan.

21.     The internal documents of GA and Heathgate establish a pattern of racketeering under 18 U.S.C. §1962.

### III.     GA'S CONTROL OF ITS SUBSIDIARIES

22.     Mr. Blue is the Chairman, President, Chief Executive Officer and a member of the Board of Directors of GA. Mr. Blue controls GA and its wholly owned subsidiaries including Defendants Heathgate and Nuclear Fuels.

23.     Mr. Blue has created over 40 entities, including the Defendants in this action. Several of these entities are involved in various ways in the uranium business. They share offices and have overlapping Boards of Directors. Mr. Blue is, however, the decision maker and business strategist for all of these entities, including Defendants.

24.     Upon information and belief, Mr. Blue's business strategy is to place a small number of loyal employees, whose actions he controls, on the Boards of Directors and in positions as officers for the various GA entities.  This placement of loyal employees allows Mr. Blue to control GA subsidiaries.

25.     If the officers and directors do not agree with Mr. Blue's decisions, Mr. Blue causes the resignation, termination, retirement, or reassignment of those officers and/or directors. In the last 18 months, Mr. Blue has terminated or caused the retirement of approximately 10 officers who objected to his plan and scheme to breach contracts.

26      GA has, in the past, attempted to exercise control over ConverDyn in this fashion but was not successful.

27.     James Graham ("Mr. Graham") is currently ConverDyn's President.  In the past, Mr. Graham has been President of Heathgate and a member of the Board of Directors of Heathgate.  He resigned from both of those positions in February 2004.

28      In 2004, John Jones ("Mr. Jones") was a member of GA's Board of Directors as well as an officer of GA.  Mr. Jones is also a member of ConverDyn's Board of Directors.  Mr. Jones was previously a member of Heathgate's Board of Directors, at least until May of 2004. Mr. Jones is also the President of General Atomics Energy Services, Inc., a GA subsidiary and partner in ConverDyn.

29.     Anthony Navarra ("Mr. Navarra") is and has been, at all relevant times, a member of the Board of Directors of ConverDyn and an officer of the parent, GA.

30.     Mr. Blue dictates the business decisions, strategies, and conduct of Mr. Jones and Mr. Navarra.

6

31.    The Officers and Directors of Nuclear Fuels and Heathgate report to GA and Mr. Blue.  Mr. Blue and GA control the business strategies of Defendants, including whether Defendants enter into contracts, the terms of the contracts, and whether these entities will honor their contracts.

## IV.    BACKROUND OF URANIUM BUSINESS

32.    Heathgate is a mining company and supplier that supplies uranium in the form of U3O8 to purchasers such as ConverDyn.  Heathgate also enters into sale agreements with utilities directly or through another GA subsidiary, Nuclear Fuels.

33.    Utilities purchase uranium and contract to have the uranium converted into uranium hexafluoride (UF6).

34.    ConverDyn supplies UF6, which is created during the uranium conversion process at a uranium conversion facility, to various utilities throughout the United States and internationally.  ConverDyn contracts for the uranium to be converted into UF6 and the conversion occurs at the Honeywell International, Inc., Metropolis, Illinois conversion facility. Storage and conversion of uranium in the United States also occurs at the Metropolis facility. After the uranium is converted to UF6, it is sent to an enrichment facility.  After enrichment, the uranium based fuel is fabricated and placed in fuel rods for the ultimate use in nuclear reactors to generate electrical power.

35.    Most utilities are regulated entities, with their rates governed by utility commissions.  Thus, they may be subject to penalties and regulatory actions if they cannot deliver electricity at the set price.  For this reason, utilities seek long term purchase contracts at a fixed price or escalated fixed price.

36.     In order to minimize market risk, suppliers such as ConverDyn, attempt to enter into simultaneous contracts with a utility and a producer to insure that they are able to purchase uranium at a fixed price for delivery to the utility at a fixed price. The quantities and delivery dates are similar. These arrangements are called "Back to Back Contracts."

37.     The uranium industry is relatively small, with a limited number of uranium sources, suppliers, converters, and utilities. As a result, consistency of supply and a company's reputation are critical in conducting business. A breach of a supplier's obligations causes irreparable damage to that company's reputation in the uranium industry and its ability to conduct business in the future.

38.     In 2000, Defendant Heathgate began producing uranium from the Beverley ISL uranium mine in South Australia.

39.      GA and Heathgate anticipated and planned for a production of approximately 22.3 million pounds of uranium from the Beverley mines over the period 2004-2010, with an expected selling price of $11/pound.

40.     Beginning in approximately 2001, GA directed its subsidiaries including Heathgate and ConverDyn to aggressively court large utilities to persuade the utilities to enter into long term contracts with Heathgate or its affiliates.

41.     GA directed Heathgate to enter into long term contracts for the sale of uranium at fixed prices so that GA could show a revenue stream to its banks and thus secure bank financing. GA directed that Heathgate should commit at least 50% of its productions to long term contracts.

42.    GA was successful in this plan.  As a result, Heathgate, ConverDyn, and Nuclear Fuels entered into long term contracts with several large nuclear utilities.

43.    These utilities represent some of the largest nuclear utilities in the world.

44.    Heathgate's American customers account for approximately 39% of the total nuclear capacity of the United States.

45.    In order to export uranium from the Beverley mine in Australia, Heathgate was required to have entered into sale agreements with purchasers.  Thus, these long term contracts allowed Heathgate to maintain its export license.

46.    These long term agreements also allowed Heathgate and GA the opportunity to obtain bank financing.

## V.    THE PLAN AND SCHEME DEVELOPED BY GA

## TO INCREASE PROFITS BY BREACHING CONTRACTS OF ITS

## AFFILIATE--HEATHGATE

47.    Various international events, including decreases in the amount of Russian highly enriched uranium available, and the temporary or permanent closures of mines in Canada, Australia, and South Africa, accelerated the expected increase in the market price of uranium.

48.    Beginning in 2003, the market price for uranium began to exceed the prices at which the GA subsidiaries were contractually obligated to sell uranium to ConverDyn as well as to end users.

49.     GA concluded that it could make substantially more money by selling the uranium from the Heathgate's Beverley mine on the spot market. Thus, GA developed a plan, scheme, and design to require its subsidiaries to renegotiate their long term fixed price contracts.

50.     An internal memo prepared in March 2004, titled "Heathgate Contract Cancellation" lays out the plan (See "Heathgate Contract Cancellation Memorandum" attached as Exhibit A). [2] GA and Heathgate explained the plan as follows: "In order to take advantage of the recent price increase and projected price stabilization well above the current contract prices, the contracts must be cancelled or otherwise restructured, as Heathgate's supply of uranium is finite and limited to its annual production capacity." (See p.2 of Exhibit A).

51.     Upon information and belief, Mr. Jones was a member of the Board of Directors of both Heathgate and GA during relevant time periods, in 2004.

52.     With the spot market price of uranium at $17/pound, the Heathgate Contract Cancellation Memorandum analyzes how Heathgate and GA would benefit from termination of the contracts in the Heathgate Contract Portfolio as follows: "the Heathgate contract portfolio results in revenues significantly below that which would result from strict spot market sales. If the maximum sales of 11.5M Lbs rather than being sold at the contract prices were sold at the projected Ux composite market price, a gain of about $50M would be realized over the seven years—an increase of about a third over the expected contracted revenue of about $154M." (See p.2 of Exhibit A).

---

[2]   A redacted version of Exhibit A is attached and the unredacted version is being filed under seal.

53.     The "Heathgate Portfolio" consists of long terms contracts with ConverDyn and nuclear utilities around the world as described in detail in the unredacted copy of Exhibit A which is filed under seal.

54.     Heathgate and GA analyzed this "lost opportunity" for the contracts in the Heathgate Portfolio, calculated to show the difference between the contract price and the March 2004 spot market price. Ignoring Heathgate's contractual obligations, Heathgate and GA regarded this amount of $50 million as their "lost opportunity."

55.     In 2004, Heathgate and GA recognized that breach of these contracts identified as the "Heathgate Portfolio" would lead to legal battles and likely punitive damages, and claims for injunctive relief. (See p. 3 of Exhibit A).

56.     Heathgate and GA, however, concluded they could use the fruits of their improper termination of these contracts, mainly the profits of selling on the spot market, to fund the anticipated litigation.

57.     In the event that Heathgate and GA decided to refuse to deliver under these contracts, the Heathgate Contract Cancellation Memorandum concluded: "during such litigation, Heathgate would sell its produced inventory at the spot market, through a third party auction (e.g. Ux or NYNCO), using the proceeds for added profit and legal defense." (see p. 3 of Exhibit A).

58.     In analyzing and discussing the ramifications of these anticipated breaches, the memo stated: "Breaching the confidence of these major international players in any way will permanently damage the reputation of Heathgate, NFC and ConverDyn and may impact other

GA nuclear related business relationships." (see Exhibit C entitled "Heathgate Contract Portfolio Options" dated March 2004 ). [3]

59.     Heathgate and & GA also analyzed a potential bankruptcy which would benefit its bank creditors to the detriment of its customers.

60.     Expecting a backlash from its customers, GA planned to anonymously move the material into the uranium market in order to avoid the anticipated refusal of the utilities to do business with GA entities in the future.  (see p.3 of Exhibit A).

61.     GA also anticipated that Heathgate "will have to move its material into the market in a controlled fashion to avoid placing downward pressure on the already volatile spot market price."  (see Exhibit D entitled "Current and Future Marketing Concerns").[4]

62.     GA was willing to run this risk with its subsidiary ConverDyn, as well as with unrelated purchasers.  GA analyzed the risk to ConverDyn as follows: "Disruption of supply under the agreement by [Heathgate] will have an immediate, significant impact on ConverDyn. Any disruption in supply to ConverDyn may not excuse ConverDyn from performance under their agreement with Dominion." (see Exhibit B entitled "Dominion"). [5]

63.     At the same time that GA was planning its "exit strategy" by way of breach of its agreements with its utility purchasers, GA was also concerned that the price might go down: "To protect GA's long term interests, the renegotiation plan should also maintain downside protection as the market could level off and pull back in the near term and is unpredictable in the long term (see following chart of market price forecasts.)" (see Exhibit E entitled "HGR

---

[3] A redacted version of Exhibit C is attached and the unredacted version is being filed under seal.
[4] A redacted version of Exhibit D is attached and the unredacted version is being filed under seal.
[5] A redacted version of Exhibit B is attached and the unredacted version is being filed under seal.

[Heathgate] Contract Renegotiation Plan"). [6] GA quite simply wanted the best of all worlds, long term supply contracts to protect them if the market went down, and the ability to breach the contracts in the Heathgate Portfolio if the market went up.

64.     The Heathgate Contract Cancellation Memorandum concluded: "It would appear, if cancellation of Heathgate's contracts is the intent, the best approach might be to first approach the customers indicating that renegotiation to or near spot prices will be the only way for Heathgate to avoid reorganization, and that through reorganization the customer would loose its contracted future supply of uranium.  If the customers cannot be convinced to renegotiate, Heathgate could enter a pre-planned reorganization and stop deliveries under the contracts, reorganize and as part of the reorganization, void the contracts.  During and after reorganization, Heathgate would sell its production on the spot market through third party auctions or offers. This path, including reorganization, would probably be easier for the current customers to accept because Heathgate would be viewed as having no choice – rather than unilaterally cancelling the contracts outright." (see p. 7 of Exhibit A).

65.     Upon information and belief, at about the same time, GA began a plan to purge its subsidiaries of any officers or board members who disagreed with the GA plan to renegotiate, and if not successful in re-negotiations, to breach their supply agreements with ConverDyn and the worlds largest utilities.

66.     These "exit strategies" were put in place when the spot market for uranium was $17/pound in March of 2004.  GA and GA affiliates began acting on the strategies in 2004.

---

[6]  A redacted version of Exhibit E is attached and the unredacted version is being filed under seal.

67.     As the price of uranium increased to $42.00/pound, GA and its subsidiaries became more emboldened and greedy.  GA and Heathgate are now causing the breaches and defaults on Heathgate's contracts with ConverDyn as well as utilities worldwide, as explained below.

## VI.     GA DEMANDS TO CONVERDYN TO RENEGOTIATE THE DOMINION/CONVERDYN SUPPLY CONTRACT

68.     On September 30, 2003, ConverDyn and Heathgate had entered into the Heathgate/ConverDyn Uranium Sale & Purchase Contract wherein ConverDyn agreed to purchase and Heathgate agreed to sell certain amounts of uranium for the years 2004-2007.

69.     At about the same time, ConverDyn had entered into the Dominion/ConverDyn Supply Contract.  This contract was made on October 1, 2003, the same day ConverDyn signed the Heathgate/ConverDyn Uranium Sale & Purchase Contract.  Pursuant to the Dominion/ConverDyn Supply Contract, ConverDyn is obligated to supply Dominion with processed uranium (UF6) for use in Dominion's reactors.  The uranium to fulfill the Dominion/ConverDyn Supply Contract was to come from the Heathgate/ConverDyn Uranium Sale & Purchase Contract.  ConverDyn would not have entered into the Dominion/ConverDyn Supply Contract but for the existence of the binding Heathgate/ConverDyn Uranium Sale & Purchase Contract.

70.     The terms of these contracts were intended and known by GA and Heathgate to be "Back to Back Contracts," meaning ConverDyn was obligated to sell UF6 to Dominion and ConverDyn would purchase the uranium to produce the UF6 from Heathgate.

71.     The Heathgate/ConverDyn Uranium Sale & Purchase Contract sets forth a minimum and maximum amount of uranium that ConverDyn is obligated to purchase for each year of the term of the contract.  The annual amounts range between 116,000 and 240,000 pounds of uranium (U3O8).

72.     ConverDyn and Heathgate agreed in the Heathgate/ConverDyn Uranium Sale & Purchase Contract to a fixed price per pound of uranium for each contract year of $10.70/pound for 2004, $10.89/pound for 2005, $11.08/pound for 2006, and $11.27/pound for 2007.

73.     The uranium (U3O8) supplied by Heathgate and purchased by ConverDyn is processed into uranium hexafluoride (UF6) at a conversion facility in Metropolis, Illinois.  The processed uranium is then used by ConverDyn to fulfill ConverDyn's obligations to Dominion.

74.     Heathgate, GA, and Nuclear Fuels knew that the uranium Heathgate supplied to ConverDyn was then immediately converted to UF6 and sold to supply Dominion.  Heathgate, GA, and Nuclear Fuels are also aware of the regulated nature of the utility industry, the market concerns of utilities, and the utilities' need for a steady supply of uranium at an agreed upon price.

75.     Between September 2003, when Heathgate entered into the Heathgate/ConverDyn Uranium Sale & Purchase Contract, and April 2004, the market price of uranium increased to approximately $17.00/pound.

76.     Beginning in April 2004, after the Heathgate Contract Cancellation Memorandum was prepared, Mr. Blue and Heathgate and GA representatives demanded that ConverDyn renegotiate the Heathgate/ConverDyn Uranium Sale & Purchase Contract.  On April 15, 2004,

and again on April 20, 2004, ConverDyn demanded written assurance of performance from Heathgate in response to Heathgate's demands and threats.

77.     On May 2, 2004, Heathgate demanded that ConverDyn extend the term of the Heathgate/ConverDyn Uranium Sale & Purchase Contract, lower the delivery amounts, and increase the contract price.

78.     During this time, Heathgate also demanded that ConverDyn request Dominion to terminate or renegotiate its Dominion/ConverDyn Supply Contract, so that Heathgate could renegotiate or terminate its Heathgate/ConverDyn Uranium Sale & Purchase Contract. Dominion refused to terminate or amend its contract with ConverDyn.

79.     On May 11, 2004, Mr. Graham spoke by telephone with Mr. Blue. Mr. Blue again demanded that Mr. Graham renegotiate the Dominion/ConverDyn Supply Contract in order to allow Heathgate and ConverDyn to amend the Heathgate/ConverDyn Uranium Sale & Purchase Contract.

80.     After the telephone conference with Mr. Blue, Mr. Graham met with Dominion representatives in Vancouver, B.C. Dominion refused to modify the price fixed in the Dominion/ConverDyn Supply Contract. Dominion, however, agreed to amend the Dominion/ConverDyn Supply Contract to allow ConverDyn to deliver the maximum number of pounds under the contract but would allow the deliveries be spread out over an additional two years. Thus, Dominion agreed to purchase less than maximum amount in the first several years of the contract. This amendment would allow Heathgate to sell on the spot market the uranium not purchased by Dominion in the early years of the contract. That spot market sale would be at a substantially higher price and that would benefit GA and Heathgate.

81.     After the meeting with the Dominion representatives, Mr. Graham spoke by telephone with Mr. Blue regarding this proposal.  Mr. Graham informed Mr. Blue that Dominion agreed to amend the Dominion/ConverDyn Supply Contract to extend the delivery schedule over a longer number of years.

82.     Mr. Graham informed Mr. Blue that Dominion insisted upon the maximum number of pounds under the Dominion/ConverDyn Supply Contract at the negotiated price in the existing agreement but that Dominion would extend the delivery schedule beyond the original contract term.  In addition, Dominion agreed to lower its 2004 delivery notice to the nominal quantity to help ConverDyn's supply difficulties with Heathgate.  Mr. Blue stated that he preferred a lower quantity of uranium than Dominion proposed and instructed Mr. Graham to again demand concessions from Dominion.

83.     The next day, May 12, 2004, Mr. Graham again met with Dominion representatives.  Dominion stated that the total volume and price must remain the same but Dominion was willing to extend the delivery schedule as discussed the previous day.

84.     Following this meeting, Mr. Graham again called Mr. Blue and explained Dominion's position.  Mr. Blue stated that the Dominion proposal was acceptable and that Mr. Graham should lock down these amended terms.  Based on ConverDyn's amendment of the Dominion/ConverDyn Supply Contract, Mr. Blue agreed to amend the Heathgate/ConverDyn Uranium Sale & Purchase Contract accordingly.  Mr. Blue stated that the amendments to the Dominion/ConverDyn Supply Contract and the Heathgate/ConverDyn Uranium Sale & Purchase Contract would help Heathgate overall in their delivery schedule.

85.     As a result, ConverDyn and Dominion amended the Dominion/ConverDyn Supply Contract on August 6, 2004.  ("Amended Dominion/ConverDyn Supply Contract").

86.     ConverDyn amended the Dominion/ConverDyn Supply Contract based solely on Mr. Blue's promises to amend the Heathgate/ConverDyn Uranium Sale & Purchase Contract. Mr. Blue agreed, on behalf of Heathgate, to amend the Heathgate/ConverDyn Uranium Sale & Purchase Contract.

87.     After ConverDyn amended the Dominion/ConverDyn Supply Contract, Heathgate then refused to execute the amended Heathgate/ConverDyn Uranium Sale & Purchase Contract.

88.     An August 9, 2004 letter from Susan Speight, Vice President of Marketing and Sales for Nuclear Fuels acting "on behalf of Heathgate's management" to Scott Lumadue, the Regional Marketing Manager for ConverDyn, reaffirmed Heathgate's contractual obligations, stating: "[r]egarding delivery commitments during the term 2005 through 2007, Heathgate management would like to continue negotiations with ConverDyn regarding the scope and term for such deliveries; however, in the absence of any agreed upon changes, Heathgate intends to honor its current contractual obligations." (see Exhibit F, Susan Speight Letter dated August 9, 2004).

89.     Upon information and belief, Heathgate had no intention of meeting its contractual obligations and GA planned to cause Heathgate to breach its contractual obligations to ConverDyn.

90.     In 2005, Heathgate sent deliveries of uranium to its account at Metropolis sufficient to meet its obligations under the Heathgate/ConverDyn Uranium Sale & Purchase Contract for its 2006 delivery obligations to ConverDyn.

91.    On March 30, 2005, June 3, 2005, June 29, 2005, September 30, 2005, and December 30, 2005, Heathgate began transferring the uranium that was to be sold to ConverDyn in 2006 to the Heathgate affiliate Nuclear Fuels. Heathgate has transferred a total of 307,346 pounds of uranium to Nuclear Fuels. These transfer orders were sent to ConverDyn via facsimile and mail. (see Exhibit G—Heathgate transfer order dated September 21, 2005, and confirmation of transfers from ConverDyn to Heathgate dated March 30, 2005, June 3, 2005, June 29, 2005, September 30, 2005, and December 30, 2005).

92.    Heathgate has stopped making deliveries of uranium to the Metropolis facility. Upon information and belief, Heathgate is delivering uranium to Cameco at a facility in Canada in order to hinder and obstruct ConverDyn's rights and remedies for Heathgate's breach of the Heathgate/ConverDyn Uranium Sale & Purchase Contract.

93.    Heathgate transferred the uranium from its account at Honeywell's Metropolis facility to Nuclear Fuels' account at Honeywell's Metropolis facility. These transfers were accomplished via book transfer through ConverDyn.

94.    Upon information and belief, Nuclear Fuels received the uranium from Heathgate for less than market value.

95.    Presently, the uranium Heathgate transferred to Nuclear Fuels is physically located at Honeywell's Metropolis plant.

96.    The transfer orders for uranium held at the Metropolis facility are received at ConverDyn in Colorado for execution. The book transfers – which transfer title to the uranium—are executed in the Colorado offices of ConverDyn.

97.    The Metropolis plant is not authorized to execute orders of transfer for title to the uranium.  Transfer orders are sent to ConverDyn's Colorado office.  Possession and title to the uranium is then transferred via book transfer in Colorado.  All such transaction and orders are sent by ConverDyn's customers to ConverDyn's Colorado offices.

98.    The market price of uranium is currently approximately $42.00/pound.

99.    Heathgate's breach and repudiation of the Heathgate/ConverDyn Uranium Sale & Purchase Contract is due solely to the fact that the market price of uranium is significantly higher than the price Heathgate agreed to in the Heathgate/ConverDyn Uranium Sale & Purchase Contract.  ConverDyn has honored all of its obligations pursuant to the Heathgate/ConverDyn Uranium Sale & Purchase Contract.  Heathgate is attempting to avoid its obligations under the Heathgate/ConverDyn Uranium Sale & Purchase Contract.

100.    Pursuant to the Heathgate/ConverDyn Uranium Sale & Purchase Contract, the Dominion/ConverDyn Supply Contract and the Amended Dominion/ConverDyn Supply Contract, each party is to give written, non-binding notice for the quantity of uranium that the party will need for the upcoming conveyance year.  Pursuant to the Amended Dominion/ConverDyn Supply Contract, Dominion supplies ConverDyn with its non-binding notice no later than July 1 proceeding each delivery year.  ConverDyn's non-binding notice is due to Heathgate the same day.  One-hundred and twenty days prior to transfer of title to the uranium, Dominion provides its written, binding notice to ConverDyn for the amount of UF6 it desires.  One-hundred and twenty days before transfer of title is also the deadline for ConverDyn to issue its written, binding notice to Heathgate.

101.     As required, on December 21, 2005 Dominion provided its binding notice to ConverDyn for the delivery to be made on April 21, 2006. (see Exhibit H, H.H. Barker Letter dated December 21, 2005).

102.     As required, on December 21, 2005 ConverDyn provided its binding notice to Heathgate for the 2006 delivery. The binding notice requested 240,000 pounds of uranium to be delivered April 21, 2006. (see Exhibit I, Suzanne M. Lansang Letter dated December 21, 2005).

103.     In early 2006, Mr. Navarra informed Honeywell that Heathgate intended to breach the Heathgate/ConverDyn Uranium Sale & Purchase Contract. On February 7, 2006, Heathgate's CEO David Christensen informed ConverDyn via fax and U.S. mail that it intended to breach the Heathgate/ConverDyn Uranium Sale & Purchase Contract unless it could be renegotiated.

104.     Presently, Mr. Navarra, who is a member of the board of directors of ConverDyn and an officer of GA, is attempting to negotiate on behalf of the GA subsidiary Heathgate to the detriment of ConverDyn. Upon information and belief, Mr. Navarra continues to negotiate with Honeywell in an attempt to convince ConverDyn to renegotiate the Heathgate/ConverDyn Uranium Sale & Purchase Contract.

105.     Mr. Blue exercises total control over GA and its affiliates, other than ConverDyn. Mr. Blue controls GA subsidiaries, including Heathgate and Nuclear Fuels. Upon information and belief, Mr. Blue and Mr. Navarra have failed to request Heathgate to abide by its contractual obligations and are encouraging this breach by Heathgate.

106.     Heathgate, GA, and Nuclear Fuels acted and continue to act in concert in breaching the Heathgate/ConverDyn Uranium Sale & Purchase Contract and in fraudulently

transferring the uranium to Nuclear Fuels that was to be used for the April 21, 2006 delivery to ConverDyn.

107.    As the spot market for uranium increased to its current price of $42/pound, GA has continued with it purge of officers and directors and has proceeded to cause its subsidiary, Heathgate, to breach its supply contract with ConverDyn as well as with other purchasers.

108.    By way of example, on March 16, 2004, Neal Blue and GA directed Heathgate to get out of its sales contracts with one customer "any way possible."

109.    GA and Heathgate have also devised a plan to "look at customers that we value and to give special treatment to them through GA!"  Apparently GA and Heathgate do not regard ConverDyn as a valued customer.

110.    Heathgate, GA, Nuclear Fuels, Mr. Jones, and Mr. Navarra's actions are all dictated by GA's President, Mr. Blue.  These entities and individuals are conspiring to breach the Heathgate/ConverDyn Uranium Sale & Purchase Contract, transfer the uranium from Heathgate's account in order to avoid Heathgate's obligations pursuant to the Heathgate/ConverDyn Uranium Sale & Purchase Contract, and gain an advantage for GA and GA subsidiaries Heathgate and Nuclear Fuels at ConverDyn's expense.

111.    The actions of GA, Heathgate, and Nuclear Fuels are accompanied by circumstances of malice and fraud, entitling ConverDyn to an award of punitive damages.

## FIRST CLAIM FOR RELIEF

## (SPECIFIC PERFORMANCE)

112.    Paragraphs 1-111 above are incorporated in these claims for relief as if stated herein.

113.    The Heathgate/ConverDyn Uranium Sale & Purchase Contract is a valid contract existing between ConverDyn and Heathgate.

114.    All conditions precedent to performance under this Heathgate/ConverDyn Uranium Sale & Purchase Contract have been performed or have occurred.

115     Heathgate, via the February 7, 2006 letter, repudiated the Heathgate/ConverDyn Uranium Sale & Purchase Contract and indicated it planned to refuse to deliver the 240,000 pounds of uranium to ConverDyn as obligated by the Heathgate/ConverDyn Uranium Sale & Purchase Contract.

116.    Heathgate failed to deliver the 240,000 pounds of uranium on April 21, 2006.

117.    Heathgate's actions indicate that it has no intentions of performing its obligations under the Heathgate/ConverDyn Uranium Sale & Purchase Contract in 2006 or during the remaining term of the contract.

118.    Heathgate is obligated to deliver a total of 589,000 pounds of uranium to ConverDyn pursuant to the Heathgate/ConverDyn Uranium Sale & Purchase Contract (This amount includes the 240,000 pounds of uranium that Heathgate was required to deliver on April 21, 2006).

119.    This is an appropriate case for specific performance due to the unique situation of the current uranium market, changes in the market, the impossibility of covering at or near the prices set out in the Heathgate/ConverDyn Uranium Sale & Purchase Contract, the fact that ConverDyn is obligated to deliver the uranium requested under the Heathgate/ConverDyn Uranium Sale & Purchase Contract to Dominion and because of the unclean hands of GA, Heathgate, and Nuclear Fuels.

120.    Heathgate has the ability to deliver the 589,000 pounds of uranium to ConverDyn, as required pursuant to Article 2 of the Heathgate/ConverDyn Uranium Sale & Purchase Contract, but has merely decided not to deliver because the market price has increased and Heathgate can make more money by selling the uranium elsewhere.

121.    The Heathgate Contract Cancellation Memorandum establishes that Heathgate at the direction of its parent GA, planned and conspired to breach contracts with ConverDyn, and other purchasers, because it can make more money by taking the uranium and selling it on the spot market.

122.    Damages in this case are an inadequate remedy.  ConverDyn will not be able to cover at or near the Heathgate/ConverDyn Uranium Sale & Purchase Contract price of approximately $11.00/pound because the current market price is approximately $42.00/pound. Further, it is likely that the price of uranium will continue to rise during the term of the Amended Dominion/ConverDyn Supply Contract thus increasing ConverDyn's damages.

123.    This Court should exercise its equitable powers and order the specific performance of the Heathgate/ConverDyn Uranium Sale & Purchase Contract.

## SECOND CLAIM FOR RELIEF

## (FRAUDULENT CONVEYANCE)

124.    Paragraphs 1-123 are incorporated in this claim for relief as if stated herein.

125.    Heathgate was obligated to deliver 240,000 pounds of uranium to ConverDyn on April 21, 2006 pursuant to the Heathgate/ConverDyn Uranium Sale & Purchase Contract.

126.    On March 30, 2005, June 3, 2005, June 29, 2005, September 30, 2005, and December 30, 2005, after this obligation arose, but before delivery, Heathgate transferred

307,346 pounds of uranium from its account at Metropolis to its affiliate, and a GA subsidiary, Nuclear Fuels.

127.    Heathgate's transfer of uranium to Nuclear Fuels was done with the actual intent to hinder and delay the delivery of uranium to ConverDyn and to defraud ConverDyn.

128.    The Heathgate Contract Cancellation Memorandum establishes that Heathgate and GA developed this scheme and plan in 2004, in order to take the uranium and sell it elsewhere at a higher price.

129.    Upon information and belief, Nuclear Fuels received the uranium from Heathgate at less than market value.

130.    The transfer from Heathgate to Nuclear Fuels was between affiliates and part of the plan and scheme developed in 2004.

131.    The transfer occurred shortly before delivery of the uranium to ConverDyn was due.

132.    Upon information and belief, this transfer was a fraudulent conveyance.

133.    ConverDyn has suffered damages as a result of Heathgate's fraudulent conveyance to Nuclear Fuels.

## THIRD CLAIM FOR RELIEF

## (BREACH OF CONTRACT)

134.    Paragraphs 1-133 are incorporated in this claim for relief as if stated herein.

135.    Heathgate has indicated by its past actions that it has no intention of delivering the remaining 589,000 pounds of uranium to ConverDyn at the price agreed upon in the Heathgate/ConverDyn Uranium Sale & Purchase Contract.

136.   All conditions precedent have occurred or have been performed.

137.   ConverDyn has been damaged and will continue to be damaged by Heathgate's breach of the Heathgate/ConverDyn Uranium Sale & Purchase Contract.

138.   ConverDyn is entitled to damages resulting from this breach.

## FOURTH CLAIM FOR RELIEF

### (TORTIOUS INTERFERENCE WITH CONVERDYN'S CONTRACT WITH HEATHGATE, AGAINST GENERAL ATOMICS TECHNOLOGIES CORPORATION AND NUCLEAR FUELS)

139.   Paragraphs 1-138 are incorporated in this claim for relief as if stated herein.

140.   The Heathgate/ConverDyn Uranium Sale & Purchase Contract is a valid contract between ConverDyn and Heathgate.

141.   GA and Nuclear Fuels intentionally and improperly interfered with the performance of the Heathgate/ConverDyn Uranium Sale & Purchase Contract through their conduct.

142.   GA and Nuclear Fuels, through their control over Heathgate have caused Heathgate's breach of the Heathgate/ConverDyn Uranium Sale & Purchase Contract, and the fraudulent conveyance to Nuclear Fuels.

143.   ConverDyn has suffered damages and will continue to suffer damages due to the tortious interference of GA and Nuclear Fuels with Heathgate's performance of its obligations under the Heathgate/ConverDyn Uranium Sale & Purchase Contract.

## FIFTH CLAIM FOR RELIEF

## (TORTIOUS INTERFERENCE OF THE CONVERDYN CONTRACT WITH

## DOMINION AGAINST GA, HEATHGATE, AND NUCLEAR FUELS)

144.    Paragraphs 1-143 are incorporated in the claim for relief as stated herein.

145.    The Amended Dominion/ConverDyn Supply Contract is a valid contract between ConverDyn and Dominion.

146.    GA, Heathgate, and Nuclear Fuels were aware of ConverDyn's obligations under the Amended Dominion/ConverDyn Supply Contract.

147.    GA, Heathgate, and Nuclear Fuels have improperly, tortiously, and intentionally interfered with ConverDyn's performance of its obligations under the Amended Dominion/ConverDyn Supply Contract.

148.    As a result, ConverDyn has suffered damages.

## SIXTH CLAIM FOR RELIEF

## (CIVIL CONSPIRACY AGAINST HEATHGATE, GENERAL ATOMICS

## TECHNOLOGIES CORPORATION, AND NUCLEAR FUELS)

149.    Paragraphs 1-148 are incorporated in this claim for relief as if stated herein.

150.    Heathgate, GA, and Nuclear Fuels, through their words and conduct, fraudulently conveyed the uranium, which Heathgate was obligated to deliver to ConverDyn under the Heathgate/ConverDyn Uranium Sale & Purchase Contract, to Nuclear Fuels.

151.    GA, and Nuclear Fuels, agreed, through their words and conduct, to tortiously interfere with Heathgate's obligations under the Heathgate/ConverDyn Uranium Sale & Purchase Contract.

152.    Heathgate, GA, and Nuclear Fuels, agreed, through their words and conduct, to tortiously interfere with ConverDyn's obligations under the Amended Dominion/ConverDyn Supply Contract.

153.    The fraudulent conveyance was done to hinder, delay, and defraud ConverDyn's right to acquire the uranium that Heathgate was obligated to deliver to ConverDyn under the Heathgate/ConverDyn Uranium Sale & Purchase Contract.

154.    ConverDyn has suffered damages and will continue to suffer damages due to the civil conspiracy of Heathgate, GA, and Nuclear Fuels.

## SEVENTH CLAIM FOR RELIEF

## (AIDING AND ABETTING AGAINST HEATHGATE, GENERAL ATOMICS TECHNOLOGIES CORPORATION, AND NUCLEAR FUELS)

155.    Paragraphs 1-154 are incorporated in this claim for relief as if stated herein.

156.    Heathgate fraudulently conveyed the uranium, which it was obligated to deliver to ConverDyn pursuant to the Heathgate/ConverDyn Uranium Sale & Purchase Contract, to its affiliate and GA' subsidiary Nuclear Fuels Corp.

157.    Heathgate, GA, and Nuclear Fuels knowingly participated in the fraudulent conveyance.

158.    GA, and Nuclear Fuels, Mr. Navarra, and Mr. Blue agreed, through their words. and conduct, to tortiously interfere with Heathgate's obligations under the Heathgate/ConverDyn Uranium Sale & Purchase Contract

159.    Heathgate, GA, Nuclear Fuels, Mr. Navarra, and Mr. Blue agreed, through their words and conduct, to tortiously interfere with the Amended Dominion/ConverDyn Supply Contract with Dominion.

160.    ConverDyn has suffered damages and will continue to suffer damages as a result of the fraudulent conveyance and the tortuous interference.

161.    ConverDyn has suffered damages and will continue to suffer damages due to Heathgate, GA, and Nuclear Fuels actions in aiding and abetting the fraudulent conveyance and the tortious interference.

## EIGHTH CLAIM FOR RELIEF

## (VIOLATION OF 18 U.S.C. § 1962 AGAINST HEATHGATE, GENERAL ATOMIC TECHNOLOGIES CORPORATION, AND NUCLEAR FUELS)

162.    Paragraphs 1-161 are incorporated in this claim for relief as if stated herein;

163.    Heathgate, GA, and Nuclear Fuels formed an ongoing enterprise, controlled by Mr. Blue. GA, through Mr. Blue's control, dictates Heathgate and Nuclear Fuels' conduct of business in the uranium industry. Mr. Blue, GA, Heathgate, and Nuclear Fuels have also acted in concert in order to defraud ConverDyn by agreeing to induce, through false promises, ConverDyn to renegotiate the Dominion/ConverDyn Supply Contract with Dominion, and by agreeing to fraudulently transfer uranium to third parties so that ConverDyn could not perform its obligations under it contract with Dominion.

164.    The fraudulent transfer was executed in order to avoid Heathgate's contractual obligations and to sell the fraudulently transferred uranium on the spot market at an increased price in order to increase profit.

165.    Heathgate, GA, and Nuclear Fuels participated in the operation and management of this enterprise.

166.    Heathgate, GA, and Nuclear Fuels executed this scheme and artifice to defraud by causing matters to be mailed and delivered by the U.S. Postal Service, and by causing communications to be transmitted by means of wire communications in interstate commerce.

167.    Heathgate, GA, and Nuclear Fuels committed among others, the following acts of mail fraud, indictable under 18 U.S.C. § 1341, and wire fraud, indictable under 18 U.S.C. § 1343, each of which constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1), and all of which collectively constitute part of a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5):

(a)    Upon information and belief, on or about March 2004 Heathgate, GA, and Nuclear Fuels agreed that in order "to take advantage of the recent price increase and projected price stabilization well above the current contract prices, the contracts must be cancelled or otherwise restructured, as Heathgate's supply of uranium is finite and limited to its annual production capacity." The uranium transfers from Heathgate to Nuclear Fuels in June and September of 2005 are part of this scheme.

(b)    Upon information and belief, on or about March 2004 Heathgate, GA, and Nuclear Fuels agreed to anonymously "to move its material into the market in a controlled fashion to avoid placing downward pressure on the already volatile spot market price."

     (c)     On May 11, 2004, Mr. Blue, acting on behalf of Heathgate, GA, and Nuclear Fuels conducted two telephone conferences with Mr. Graham, in which Mr. Blue knowingly misrepresented that Heathgate had agreed to amend the Heathgate/ConverDyn Uranium Sale & Purchase Contract;

     (d)     On May 12, 2004, Mr. Blue again knowingly misrepresented to Mr. Graham, via telephone conference, that Heathgate would execute the amended Heathgate/ConverDyn Uranium Sale & Purchase Contract;

     (e)     On June 16, 2004 Heathgate requested that ConverDyn renegotiate the Heathgate/ConverDyn Uranium Sale & Purchase Contract in a letter sent via fax. Upon information and belief, a copy of this letter was also sent via United States Mail;

     (f)     On August 9, 2004 Heathgate requested that ConverDyn renegotiate the Heathgate/ConverDyn Uranium Sale & Purchase Contract in a letter sent via fax. Heathgate also promised, falsely, to abide by the terms of the Heathgate/ConverDyn Uranium Sale & Purchase Contract. Upon information and belief, a copy of this letter was also sent via United States Mail;

     (g)     On March 30, 2005, Heathgate, at the direction of GA, caused title to 63,791 pounds of uranium to be fraudulently transferred via wire to Nuclear Fuels in order to avoid Heathgate's contractual obligations to ConverDyn, to avoid potential injunctions, and to sell the uranium on the spot market at a higher price. This transfer was directed via letter faxed from Heathgate to ConverDyn. Upon information and belief, a copy of this letter was also sent via United States Mail;

(h)  On June 3, 2005, Heathgate, at the direction of GA, caused title to 48,278 pounds of uranium to be fraudulently transferred via wire to Nuclear Fuels in order to avoid Heathgate's contractual obligations to ConverDyn, to avoid potential injunctions, and to sell the uranium on the spot market at a higher price;

(i)  On June 29, 2005 Heathgate, at the direction of GA, caused title to 49,833 pounds of uranium to be fraudulently transferred to Nuclear Fuels in order to avoid Heathgate's contractual obligations to ConverDyn, to avoid potential injunctions, and to sell the uranium on the spot market at a higher price;

(j)  On September 30, 2005, Heathgate, at the direction of Mr. Blue and GA, caused title to 123,485 pounds of uranium to be fraudulently transferred via wire to Nuclear Fuels in order to avoid Heathgate's contractual obligations to ConverDyn, to avoid potential injunctions, and to sell the uranium on the spot market at a higher price. This transfer was directed via letter faxed from Heathgate to ConverDyn on September 21, 2005.  Upon information and belief, a copy of this letter was also sent via United States Mail;

(k)  On December 30, 2005, Heathgate, at the direction of GA, caused title to 21,959 pounds of uranium to be fraudulently transferred via wire to Nuclear Fuels in order to avoid Heathgate's contractual obligations to ConverDyn, to avoid potential injunctions, and to sell the uranium on the spot market at a higher price.

(l)  On February 7, 2006, Heathgate sent ConverDyn, via fax, a letter threatening to breach and demanding ConverDyn renegotiate the Heathgate/ConverDyn

Uranium Sale & Purchase Contract. Upon information and belief, a copy of this letter was sent via the United States Mail.

168.     Upon information and belief, Heathgate, GA, and Nuclear Fuels' scheme to defraud ConverDyn was part of a larger plan to defraud several, if not all, of Heathgate's customers in order to take advantage of the increase of price in the uranium market;

169.     Heathgate, GA, Nuclear Fuels used other devices, schemes, and artifices to defraud ConverDyn by causing misleading and false communications to be mailed and delivered by the United States Postal Office,  indictable under 18 U.S.C. § 1341, and by causing misleading and false communications to be transmitted via wire communications in interstate commerce indictable under 18 U.S.C. § 1343, each of which constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1), and all of which collectively constituted part of a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  Upon information and belief, Heathgate, GA, and Nuclear Fuels communicated amongst each other via United States Mail and via interstate wire communications in order to plan, prepare, execute, and coordinate their scheme to defraud ConverDyn and other customers.

170.     Heathgate, GA, and Nuclear Fuels' actions were carried out with the intent to defraud ConverDyn in order to increase the profits of GA and GA controlled subsidiaries;

171.     Heathgate, GA, and Nuclear Fuels are each "person[s]" within the meaning of 18 U.S.C. § 1961(3);

172.     Upon information and belief, Heathgate, GA, and Nuclear Fuels received income from the pattern of racketeering activity and used the income or its proceeds to operate itself and

to fund future legal disputes over the actions detailed in this complaint, in violation of 18 U.S.C. § 1962(a);

173. The enterprise and pattern of racketeering activity directly affected, and will continue to affect, interstate commerce;

174. Heathgate, GA, and Nuclear Fuels conspired amongst each other to violate provisions of 18 U.S.C. § 1962(a), and that conspiracy by these defendants violated 18 U.S.C. § 1962(d);

175. ConverDyn has been injured by Heathgate, GA, and Nuclear Fuels' schemes.

176. ConverDyn is entitled to treble damages, reasonable attorney fees, expenses, and costs pursuant to 18 U.S.C. 1964(c); and

177. ConverDyn also seeks such additional relief as is just and proper under the circumstances.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in its favor on its Claims, exercise its equitable powers in granting specific performance, award it treble damages, award it punitive damages due to defendants fraudulent, malicious, and willful and wanton conduct, award it costs, including but not limited to attorney's fees and expert witness fees, interest as provided by statute, and such other and further relief as this Court deems appropriate.

**PLAINTIFF DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 3rd day of May, 2006.

KONCILJA & ASSOCIATES, P.C.

s/ Frances A. Koncilja

**Frances A. Koncilja**
800 – 18th Street, Suite 300
Denver, CO 80202
Telephone:  (303) 675-0900
Facsimile: (303) 675-0401
E-Mail: mail @koncilja.com
ATTORNEY FOR PLAINTIFF